**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ARNOLD CHAPMAN and PALDO SIGN AND DISPLAY COMPANY, individually and as the representative of a class of similarly-situated persons,** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 09 C 07299** |
| **v.** | ) ) | **Judge John J. Tharp, Jr.** |
| **WAGENER EQUITIES, INC. and DANIEL WAGENER,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This is what is known in the vernacular as a "junk fax" case. The plaintiff asserts, on behalf of itself and a putative class, that the defendants faxed unsolicited advertisements to thousands of individuals and entities, thereby violating the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Before the Court are the plaintiff's Renewed Motion for Class Certification (Dkt. 191; 212) and defendant Wagener's Motion to Dismiss the Second Amended Complaint (Dkt. 200). For the reasons explained below, the plaintiff's motion is granted, and Wagener's motion is denied.

### I.     Background

#### A.  Procedural Background

The plaintiff's Renewed Motion for Class Certification and Wagener's Motion to Dismiss are pending after a long and winding road through this Court and state court. On September 18, 2009, Arnold Chapman, individually and as the representative of a putative class of similarly-situated persons, filed a class action complaint in the Circuit Court of Lake County,

Illinois against Wagener Equities, Inc. ("WEI"). Dkt. 1-2. Chapman alleged that WEI violated the Telephone Consumer Protection Act ("TCPA"), which makes it unlawful for any person "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless, among other conditions, (1) the "unsolicited advertisement is from a sender with an established relationship with the recipient" and (2) the sender obtained the fax numbers through that established business relationship or from a directory, advertisement, or site on the web to which the recipient voluntarily agreed to make its fax number available for public distribution. 47 U.S.C. § 227(b)(1)(C), (b)(1)(C)(i), (ii). In particular, Chapman alleged that WEI faxed an advertisement to him on November 6, 2006 without his permission, and that WEI faxed the same and similar advertisements to more than 39 other recipients, also without permission. Dkt. 1-2 at 2-3. Chapman sought the certification of a class defined as:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of Defendant, (3) with respect to whom Defendant did not have prior express permission or invitation for the sending of such faxes and (4) with whom Defendant did not have an established business relationship.

*Id.* at 3. Chapman further alleged that WEI committed the common law tort of conversion for the permanent misappropriation of the potential class members' fax machines, toner, paper, and employee time. *Id.* at 8. Finally, Chapman alleged that WEI violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 for WEI's unfair practice of sending unsolicited and unlawful fax advertisements to the potential class members, who were forced to incur expense without any consideration in return. *Id.*

WEI removed to federal court and answered the complaint on January 8, 2010. Dkt. 18. On July 16, 2010, Chapman was granted leave to file a First Amended Class Action Complaint, which he filed the same day. Dkt. 33, 34. Among other revisions, the amended complaint added as a defendant Daniel Wagener, the president of WEI and the individual who, Chapman alleged, personally approved, authorized, and participated in the "scheme to broadcast unsolicited advertisements via facsimile …." Dkt. 22 at 1-2; Dkt. 34 at 2-3. WEI and Wagener answered the amended complaint on August 20, 2010. Dkt. 36.

On May 25, 2011, Chapman filed a Motion for Class Certification. Dkt. 60. He proposed the following class definition:

> All persons who were successfully sent a facsimile from "Wagener Equities" on November 9, 2006, or November 10, 2006, stating that people "Looking for Industrial Property" should "Go To: www.FindIndustrialRE.com" or call "1-800-511-8943" "to be removed from our database."

*Id.* at 1. On January 25, 2012, Chapman filed a Motion to Modify the Proposed Class Definition, which was granted on December 13, 2012. Dkt. 115 at 1-2; Dkt. 189. The modified class definition, which is the operative definition for the purposes of the two motions presently before this Court, is the following:

> All persons who were successfully sent a facsimile from "Wagener Equities" on November 9, 2006, or November 10, 2006, stating that people "Looking for Industrial Property" should "Go To: www.FindIndustrialRE.com."

Dkt. 115 at 2. This Court also permitted Chapman to join Paldo Sign & Display Company ("Paldo Sign") as a named plaintiff.[1] Dkt. 189 at 14. Chapman and Paldo Sign filed their Second

---

[1] The motion to amend was predicated, in part, on adding Paldo Sign as a named representative to moot arguments about Chapman's adequacy as a class representative in view of the fact that he was in federal prison when the defendants allegedly sent the fax in question to his fax machine. So far as the docket reflects, Chapman remains a named plaintiff in this case, but

Amended Complaint and Renewed Motion for Class Certification on December 17, 2012. Dkt. 190, 191. WEI answered the amended complaint and Wagener filed a Motion to Dismiss on January 21, 2013. Dkt. 199, 200. Wagener also answered on April 23, 2013. Dkt. 209. After extensive briefing by both sides, the Court turns to the two pending motions.

### B. Factual Background[2]

On November 10, 2006, Paldo Sign and Display Company, an Illinois corporation, allegedly received a fax from Wagener Equities. Dkt. 190 at 2-3. The fax directed recipients "Looking for Industrial Property" to "Search the most complete Chicago area Property Database for – FREE" at "www.FindIndustrialRE.com." Dkt. 190-2. The fax also explained that if recipients "received this fax in error and would like to be removed from our database," they should call "1-800-511-8943." *Id.*

Defendant WEI is "an industrial real estate brokerage, sales, leasing and property management company." Dkt. 212-1 at 6; Deposition of Daniel Wagener (Oct. 12, 2010) (Dkt. 212-1) at 6 ("Wagener Dep."). Daniel Wagener is the president of WEI and has been in that position since approximately 2005. Wagener Dep. at 6. According to Wagener, a company called the Marketing Research Center ("MRC")[3] contacted Wagener in 2006 to sell a "fax broadcast" to

---

the parties' briefs on the class certification motion focus almost exclusively on Paldo Sign's claim. Accordingly, except where arguments relating to Chapman have been made, the Court does the same.

[2] The Court recited, in detail, the facts of this dispute in its decision in *Chapman v. Wagener Equities, Inc.*, No. 09 C 07299, 2012 WL 6214597 (N.D. Ill. Dec. 13, 2012). Certain facts are repeated here, along with facts extracted from the Second Amended Class Action Complaint, the Renewed Motion for Class Certification, and the depositions, expert reports, and other exhibits filed by the parties with this Court. Dkt. 190, 191.

[3] Caroline Abraham, who ran Business to Business Solutions ("B2B"), stated at her deposition that the "Marketing Research Center" is "not an entity at all. It's just a name on a letterhead." Deposition of Caroline Abraham (Mar. 28, 2011) (Dkt. 212-2) at 56 ("Abraham Dep."). "B2B used some standard letterheads, sometimes saying 'Maxileads' or the 'Marketing

WEI. *Id.* at 18-19, 74. MRC created sample faxes for WEI, which Wagener reviewed. *Id.* at 31.

Wagener then provided MRC with "something that I had worked on," "an informational piece on

FindIndustrialRE.com." *Id.* at 37-38. The intended targets of the faxes were "industrial users …

people who would be interested in industrial real estate…." *Id.* at 47-48. As for how WEI would

benefit from traffic to FindIndustrialRE.com, Wagener testified at his deposition,

> The party who would go on this site, if they found something of
> interest and … freely looked at the information and said I want
> more information and contacted my office, they would contact me
> or my office. If they decided to work with us and said I'm looking
> for a space … then we maybe can work with them and ultimately
> sell or lease a building to them, potentially.

*Id.* at 69. Ultimately, Wagener instructed the vice president of WEI to write a check for $668

made payable to Business to Business Solutions for the faxes. *Id.* at 51. But on the day WEI

learned the fax had been sent, Wagener attempted to contact MRC to cancel the check. *Id.* at 76-

77, 91-92. Wagener believed MRC would not send the fax until MRC sent to Wagener a list of

the intended recipients. *Id.* at 91.

Paldo Sign contends that WEI and Wagener paid MRC (a.k.a. B2B) to send the fax to

20,000 recipients. Dkt. 212 at 3. Paldo Sign further contends that B2B sent the fax to fax

numbers in a database it had purchased from InfoUSA and that neither B2B nor WEI received

consent from the targeted recipients, a group that included Paldo Sign. *Id.* at 4-5. According to

Robert Biggerstaff, the plaintiff's expert, "a total of 10,145 successful fax transmissions were

successfully sent and received by 10,145 unique fax numbers" in Illinois and Indiana. Dkt. 212-3

at 3; Dkt. 212 at 6. The data relied on by Biggerstaff also showed that the fax was successfully

sent to Paldo Sign. Dkt. 212 at 5.

---

Research Center.'" Declaration of Caroline Abraham (Dec. 28, 2010) (Dkt. 212-5) ¶ 8
("Abraham Decl.").

## II. Analysis

### A. The Renewed Motion for Class Certification

Class certification is normal in litigation under § 227. *See Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682, 684 (7th Cir. 2013). Paldo Sign asserts that it is part of a class of intended recipients who received WEI's and Wagener's unsolicited fax advertisement on November 9 and 10, 2006, in violation of the TCPA. The class is defined as:

> All persons who were successfully sent a facsimile from "Wagener Equities" on November 9, 2006, or November 10, 2006, stating that people "Looking for Industrial Property" should "Go To: www.FindIndustrialRE.com."

Dkt. 212 at 8.

Federal Rule of Civil Procedure 23(a) governs class actions and requires four prerequisites before a class can be certified: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a)(1)-(4); *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2550 (2011) ("The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.") (quotation marks and citations omitted). If Paldo Sign meets this initial burden, it must also show that the requirements for one of the three subsections of Rule 23(b) are met.[4] *See Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir.

---

[4] The three requirements listed in Rule 23(b) are: (1) prosecuting separate actions would create a risk of inconsistent or varying adjudications or individual adjudications that would be dispositive of the interests of other members; (2) "[T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

2006). Here, Paldo Sign seeks certification of a class pursuant to Rule 23(b)(3); Paldo Sign must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Finally, in addition to the Rule 23 requirements, the party seeking certification must provide a class definition by showing that the members of the class are identifiable. *See Oshana*, 472 F.3d at 513.

Overall, to grant class certification under Rule 23, the Court must be "satisfied, after a rigorous analysis," touching on the merits where necessary, that the requirements of Rule 23 are met. *Wal-Mart*, 131 S. Ct. at 2551 (citation omitted). Under *Wal-Mart*, Paldo Sign must demonstrate with proof, at the class-certification stage, that the requirements of Rule 23 are satisfied. 131 S. Ct. at 2551-52. Yet Paldo Sign need not make that showing to a degree of absolute certainty. *See Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, it is sufficient if each disputed requirement has been proven by a preponderance of the evidence. *Id.* (citation omitted). If all of the Rule 23 requirements are met, Paldo Sign is entitled to pursue its claim as a class action. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins Co..*, 559 U.S. 393, 398 (2010).

District courts have broad discretion in deciding motions for class certification. *See Reiter v. Sonotome Corp.*, 442 U.S. 330, 345 (1979). Further, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machs., Inc.*, 249

---

corresponding declaratory relief is appropriate respecting the class as a whole"; or (3) "[T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(1)-(3).

F.3d 672, 676 (7th Cir. 2001). In other words, the Court is not required to limit itself to the allegations in Paldo Sign's Second Amended Complaint. *Id.*

### 1. The Class Definition is Sufficient.

As an initial matter, WEI and Wagener argue that Paldo Sign's proposed class definition is deficient for four reasons: (1) the definition includes individuals who do not have standing, such as individuals who were not the owners of the receiving fax machines; (2) the two named plaintiffs do not fall within the proposed class because Paldo Sign is a corporation and not a person, and Chapman did not suffer any damages; (3) the definition does not specify whether the recipients did not consent to receive the fax; and (4) the definition fails to limit class members to those individuals who received a fax on a "telephone facsimile machine." Dkt. 216 at 4-7. A class definition must be definite enough that the class can be ascertained. *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)).

The putative class includes "all persons … who were successfully sent a fax …." WEI and Wagener first argue that this language is too broad because it includes individuals who were not the owners of the receiving fax machines and therefore lack standing. Dkt. 216 at 4-5. The TCPA, however, contains no terms that would limit violation claims to those who own machines assaulted by junk faxes. To the contrary, the statute focuses on the unauthorized sending of unsolicited faxes, not on who receives those faxes. *See* 47 U.S.C. § 227(b)(1)(C) ("It shall be unlawful for any person … to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement"); *see also, e.g., Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2011 WL 4628744, at *3 (N.D. Ill. Sept. 30, 2011) ("language regarding ownership of the receiving machines is not required by the Act");

*G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, No. 08 C 4521, 2010 WL 744262, at *2 (N.D. Ill. Feb. 25, 2010) ("such language is not required by the statute and actually has the potential to invite multiple claims for each fax") (citing *Holtzman v. Turza*, No. 08 C 2014, 2009 WL 3334909, at *6 (N.D. Ill. Oct. 14, 2009) (rejecting class definition that required ownership)).

The defendants urge the Court to follow the rationale of *Compressor Eng'g Corp. v. Mfgrs. Financial Corp.*, where the court held that the person or entity that "own[s] the fax machine that received the unsolicited fax advertisement at issue is the person or entity with standing to assert a TCPA claim." 292 F.R.D. 433, 448-49 (E.D. Mich. 2013). The premise of that ruling is that an injury under the TCPA is the physical conversion of paper and ink caused by junk faxes, an injury that would be suffered only by the owner of the fax machine. *Id.* at 448 ("the TCPA was intended to address … the cost of the paper and ink incurred by the owner of the fax machine …."). While the conversion of paper and ink is certainly an injury that a TCPA violation might cause, it is not the only injury covered by the statute. Indeed, the Seventh Circuit has rejected the premise that financial injury (from the conversion of paper and ink) is the only injury relevant to a standing analysis under the TCPA. In *Holtzman v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013), the court made it clear that the plaintiff in a TCPA class action is not required to prove "that he printed the fax (wasting paper) or otherwise suffered monetary loss." The court continued, "[E]ven a recipient who gets the fax on a computer and deletes it without printing suffers *some* loss: the value of the time necessary to realize that the inbox has been cluttered by junk. That loss, and the statutory remedy, are the same for all recipients …." *Id.* (emphasis in original). Moreover, the plaintiff representative in *Holtzman* testified in his deposition that his secretary "screened and deleted unwanted faxes." *Id.* at 685. In other words, the recipient did not control the device that received the fax. The court's rationale in *Compressor* cannot be squared

with the Seventh Circuit's holding in *Holtzman*, and it is the latter, of course, that controls in this case. In sum, the class definition does not require a qualification that the recipients are limited to individuals who own the receiving devices.

Second, the defendants argue that Paldo Sign is a corporation, not a person, and therefore cannot properly be included in the plaintiff's class definition. *Id.* at 6. As Paldo Sign correctly points out, however, the chapter in which the TCPA is listed, Chapter 5, Wire or Radio Communication, defines "for the purposes of this chapter, unless the context otherwise requires" the term "person" to "include[] an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C.A. § 153(39) ("Definitions"). Further, corporate class representatives have been permitted in many other TCPA cases in this district and elsewhere. *See, e.g., Maxum Indemnity Co. v. Eclipse Mfg. Co.*, 06 C 04946, 2013 WL 5993389, at *7 (N.D. Ill. Nov. 12, 2013) ("Since the TCPA makes no distinction among individuals, corporations, and other business entities, it follows that the TCPA created by statute a right of privacy for all three: a right not to be intruded upon by unwanted faxes."); *Hinman and Italia Foods, Inc. v. M and M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 805 (N.D. Ill. 2008)  (manufacturing companies alleging violation of TCPA had standing to pursue class claims); *Green v. Service Master on Location Services Corp.*, No. 07 C 4705, 2009 WL 1810769, at *3 (N.D. Ill. June 22, 2009) (certifying class with Illinois corporation as class representative); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07 C 5953, 2009 WL 2581324, at *8 (N.D. Ill. Aug. 20, 2009) (same).

Third, the defendants argue that the class definition is deficient because it does not specify whether the recipients did or did not consent to receive the fax. Dkt. 216 at 7. To avoid violating the TCPA, and in the absence of an "established business relationship" with the

recipient, the sender[5] must obtain the "prior express invitation or permission" from the consumer before sending a fax. 21 F.C.C.R. 3787, at 3806-07 (*In the Matter of Rules and Regulations Implementing the [TCPA]*) (Apr. 6, 2006). But consent is a defense to liability under the TCPA, and a class definition need not negate the possibility of a successful defense as to the merits of the claim. That would, as the Seventh Circuit recently noted in *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014), "put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified." The availability of a defense is not necessarily irrelevant to the class certification inquiry; it may be relevant (in some cases, but not in this one, as discussed further below) to the adequacy of the plaintiff as a class representative, or to the question of whether common issues predominate over individual issues—but as *Parko* teaches, it does not restrict the scope of the class itself.[6] The class definition requires that class members be reasonably ascertainable, *see Alliance to End Repression*, 565 F.2d at 977 and Rule 23(c)(1)(B), not that they demonstrate a reasonable likelihood of success on the merits.

In any event, there is no reason to believe in this case that including the requirement of lack of consent in the class definition would materially reduce the scope of the class. There is no evidence in the record, nor do the defendants offer any now (save the defendants' evidence as to Paldo Sign's purported consent, which is addressed below), that any of the alleged recipients of

[5] Under the FCC's interpretation of the fax advertising rules, the "sender" is "the person or entity on whose behalf the advertisement is sent. In most instances, this will be the entity whose product or service is advertised or promoted in the message." 21 F.C.C.R. 3787, at 3808. In this case, as discussed in the context of the pending motion to dismiss, the "sender" is WEI and Daniel Wagener.

[6] If class plaintiffs define classes that are ascertainable but too broad, they run the risk of creating problems satisfying the other Rule 23 criteria for certification. It would promote clarity if, when the scope of a class definition creates issues as to whether the proposed class satisfies the requirements of Rule 23, defendants would attack those problems in the context of the 23(a) and/or 23(b) criteria that are implicated rather than by targeting the scope of the definition itself.

the WEI fax consented to receipt of the fax. To the contrary, the evidence establishes that the defendants did nothing to confirm that the intended 20,000 recipients of their fax had affirmatively consented to receive such faxes; rather, the evidence of record indicates that they simply hired the services of a "fax blaster" company without any inquiry as to whether or how that company obtained consent. Further, both Caroline Abraham and Daniel Wagener admit that they did not seek the consent of any of the recipients before the fax was sent. Abraham Decl. at 6-8; Wagener Dep. at 55. The mere possibility that "some of the proposed class members may have independently consented does not warrant denial of class certification." *GM Sign, Inc. v. Group C Commc'ns*, No. 08 C 4521, 2010 WL 744262, *3 (N.D. Ill. Feb. 25, 2010) (rejecting argument that lack of language negating consent in class definition rendered class unascertainable). *See also, e.g., Savanna Group, Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 66181, at *3-4 (N.D. Ill. Jan. 4, 2013) (rejecting defendant's consent objection to class definition because defendant failed to offer specific evidence of consent with intended fax recipients).

Fourth, and finally, the defendants argue that the class definition is deficient because it fails to limit potential class members to those individuals who received the fax on a "telephone facsimile machine." Dkt. 216 at 7. The same problem afflicts this argument: it goes to the merits of the claim, not to the ascertainability of the class. In any event, the Court rejects this argument because the TCPA is not limited to faxes sent to the increasingly archaic fax machine. The statute itself says so, defining "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." 47 U.S.C.A. § 227(a)(3). Further, in 2003, the FCC stated,

> We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes. However, we clarify that the prohibition does not extend to facsimile messages sent as email over the Internet. The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways. Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes.

18 F.C.C.R. 14014, 14133 (July 3, 2003). The Seventh Circuit recently confirmed this interpretation of the TCPA in *Holtzman*. The court wrote, "Even a recipient who gets the fax on a computer and deletes it without printing suffers *some* loss: the value of the time necessary to realize that the inbox has been cluttered by junk. That loss, and the statutory remedy, are the same for all recipients …." 728 F.3d at 684 (emphasis in original). The defendants' argument that the fax must have been received on a traditional fax machine is therefore rejected.

### 2. Whether the Fax is an Advertisement under the TCPA is a Class-Wide Question.

The parties dispute whether the WEI fax is an "advertisement" under the TCPA. The defendants argue that the fax "simply provides a website address that enables a potential user to search commercial property in the Chicago area, including properties in no way affiliated with WEI." Dkt. 216 at 7. The defendants add that since the fax does not promote a commercially available service, it was not sent in violation of the TCPA. *Id.* Paldo Sign disagrees, but it is not necessary to resolve this dispute at this juncture. Whether the fax in question is an "advertisement" under the TCPA is a question that is common to all potential members of the proposed class. *See, e.g., Turza,* 728 F.3d at 684 ("questions, such as whether a given fax is an advertisement, are common to all recipients"); *Hinman*, 545 F. Supp. 2d at 807 (noting that common questions included whether faxes were "advertisements"); *Saf-T-Gard Intern., Inc. v.*

*Vanguard Energy Servs., LLC*, No. 12 C 3671, 2012 WL 6106714, at *5 (N.D. Ill. Dec. 6, 2012) ("common questions are … whether the materials sent by [the defendant] to class members actually constituted fax advertisements …."). Class certification, therefore, is not prohibited on the basis that the question of whether the fax was an advertisement is still unanswered.[7]

### 3. Paldo Sign Has Satisfied the Rule 23(a) and 23(b) Requirements.

As discussed above, Federal Rule of Civil Procedure 23(a) governs class actions and requires four prerequisites before a class can be certified: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Fed. R. Civ. P. 23(a)(1)-(4); *Wal-Mart*, 131 S. Ct. at 2550. If Paldo Sign meets this initial burden, it must also show that the requirements for one of the three subsections of Rule 23(b) are met. *See Oshana*, 472 F.3d at 513. Paldo Sign seeks certification of a class pursuant to Rule 23(b)(3); Paldo Sign must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### a. Numerosity.

Rule 23 requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs are not required to specify the exact number of persons in the class, nor are plaintiffs required to establish the exact identity of the class members. *See Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989) (citation omitted);

---

[7] In this regard, the Court notes that Wagener explained at his deposition that he believed WEI would benefit from traffic to the website www.FindIndustrialRE.com; the party would "contact me or my office" "if they found something of interest" on the site, and then WEI would potentially "sell or lease a building to them." Wagener Dep. at 69. Further, WEI and Wagener characterized the faxes as "ads" on the check stub connected to WEI's payment to B2B. Dkt. 212-6 at 26.

*see, e.g., G.M. Sign*, 2009 WL 2581324, at *4 (the plaintiff "need not establish the exact identity of the class members"). Plaintiffs may not, however, rely solely on conclusory allegations as to the size of the class. *See Marcial*, 880 F.2d at 957 (citation omitted).

Paldo Sign relies on the report of Robert Biggerstaff, its retained expert, to assert numerosity. Biggerstaff reviewed B2B's archived computer files and business records to determine how many successful transmissions of the WEI fax occurred on November 9 and 10, 2006. Dkt. 212-3 at 2-3. In particular, Biggerstaff reviewed a B2B hard drive, which contained archived files that referenced Wagener Equities. *Id.* at 2. He concluded that those files showed 10,145 successful and error-free transmissions of the fax.[8] *Id.* at 3. Biggerstaff also explained that "a record of a 'successful' transmission by computer based facsimile transmission systems reflects the successful completion of all 5 phases" of a fax (call establishment, pre-message procedure, in-message procedure and message transmission, post-message procedure, and call release). *Id.* at 4-5. Biggerstaff added that a record of successful transmission "is a record that such transmission was sent to and received by 'equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id.* at 5-6. The B2B records establish that thousands of individuals received the fax. Other courts in this district have come to the same conclusion about fax logs identical or similar to the logs at issue in this case. *See, e.g., G.M. Sign*, 2009 WL 2581324, at *4 (records of

---

[8] Biggerstaff wrote in his report that the file "T102605_WagenerEquitiesTheirsCombo061110A-Wagener.ps" was associated with two archives: "/fax2/FaxBak/2006.11.10-Wagener_FINAL/" and "/fax2/FaxBak/2006.11.10-DetaliiWagener20061109_0/." Biggerstaff found that the former included a file that contained 4,795 records of attempted fax transmissions, of which 3,648 transmissions were successful and error-free. Biggerstaff found that the latter included a file that contained 8,555 records of attempted fax transmissions, of which 6,497 transmissions were successful and error-free. Biggerstaff added the two groups of successful transmissions, for a total of 10,145 successful, error-free transmissions. Dkt. 212-3 at 2-3.

Maxileads, a.k.a. B2B, sufficient to show numerosity); *Hinman,* 545 F. Supp. 2d at 806 (evidence of thousands of faxes was sufficient).

The defendants argue that Paldo Sign has failed to show numerosity for three reasons: (1) Paldo Sign has offered no evidence of actual receipt of the fax by any of the proposed class members; (2) Paldo Sign's evidence is not properly authenticated; and (3) Paldo Sign's evidence is not reliable. Dkt. 216 at 9-14.

### i.      "Sent" vs. "receipt.

The Court begins with the TCPA itself, which prohibits the use of any "telephone facsimile machine, computer, or other device *to send* to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C.A. § 227(b)(1)(C) (emphasis added). The plain language of the statute does not refer to any requirement that the fax is *actually* received by the addressee. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Assoc. v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation omitted). Persuasive authority in the Seventh Circuit is consistent; a violation of the TCPA simply requires that an unsolicited fax is sent, not that the plaintiff must prove that it was received (that is, that an individual actually viewed it). *See, e.g., Bridgeview*, 2011 WL 4585028, at *3 (collecting cases in this district in which courts certified classes where class definition employed the word "sent" as opposed to "received").

The question remains, however, of what "to send" means under the TCPA. Paldo Sign does not argue that "to send" means that a fax that was initiated, but that bounced back with an error message indicating that no transmission had been accepted by the machine assigned to that fax number, would suffice under the TCPA. Biggerstaff explained in his report that the

successful transmission of a fax requires that the transmission "was sent to and received by" the recipient. Dkt. 212-3 at 6. The Seventh Circuit recently agreed with this interpretation in *Holtzman v. Turza*:

> To the extent Turza contends that each recipient must prove that his fax machine or computer received the fax, he is right . . . . The record establishes which transmissions were received and which were not. [The defendant] hired [the fax broadcaster] to send the faxes. It compiled information about which faxes were received, and by whom … Transmitting a fax requires a sending and a receiving machine to communicate using a standard protocol. If the transmission ends successfully, the receiving machine sends a code indicating this. [The fax broadcaster] kept a log of the codes received during the process of sending [the defendant's] faxes. This log shows that it tried to send a total of 11,945 faxes to 221 unique numbers; the receiving fax machines reported that 8,630 of these were delivered successfully … There is accordingly no need for recipient-by-recipient adjudication …

728 F.3d at 684-85. In other words, "to send" under the TCPA means not only that a fax was released from the sending machine, but that the receiving device indicated receipt. This is a different proposition, and an important distinction, from proof of actual receipt, such as proof that a person on the receiving end actually printed the fax and/or reviewed it. Direct proof of actual receipt is not required; rather, circumstantial evidence that the fax was *successfully* transmitted is sufficient. *See, e.g., CE Design*, 259 F.R.D. at 142 (defendant's argument that TCPA requires proof of receipt was incorrect where plaintiff "provided circumstantial proof of receipt by all of the numbers to which the fax logs indicate faxes were successfully sent"); *Savanna Group*, 2013 WL 66181, at *5 (holding that the defendant's attempt to defeat numerosity based on an alleged distinction between "sent" and "received" was unpersuasive and finding that "plaintiff has produced circumstantial evidence of receipt through the fax logs").

Consistent with this discussion, the proposed class definition appropriately excludes unsuccessful transmissions, clearly limiting the class to "all persons who were *successfully sent* a

facsimile from 'Wagener Equities' on November 9, 2006, or November 10, 2006 ….." Dkt. 191 at 1 (emphasis added). *See, e.g., CE Design*, 259 F.R.D. at 141 ("the class should be defined in terms of those who received faxes, rather than those to whom attempts were made to send faxes.")

### ii.     Authentication.

The defendants also argue that Paldo Sign failed to demonstrate that its evidence in support of numerosity—the B2B hard drive—was properly authenticated. Dkt. 216 at 10. The defendants complain that Biggerstaff wrote in his report that he received the hard drive from the plaintiff's counsel, Ryan Kelly, but that Kelly provided no declaration or affidavit regarding the source and handling of the hard drive. *Id.* The defendants further argue that Caroline Abraham could not authenticate the hard drive because she was not involved in its transfer or handling and that Joel Abraham, Caroline Abraham's son, could not authenticate the hard drive because of various deficiencies in his handling of the drive. *Id.* at 11-12.

Under Federal Rule of Evidence 803(6) ("Records of a Regularly Conducted Activity"), a record of an act or event is admissible with the testimony of the custodian or another qualified witness if the record was made at or near the time by someone with knowledge, the record was kept in the course of a regularly conducted activity of a business, and it was a regular practice of that business to make the record. Further, to authenticate, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The proponent may do so through such methods as the "testimony of a witness with knowledge." Fed. R. Evid. 901(b).

In support of authentication of the B2B hard drive, Paldo Sign offers the deposition testimony of Caroline Abraham and Joel Abraham, as well as Caroline Abraham's declaration.

Ms. Abraham testified that Mr. Abraham gave the hard drive to the plaintiff's attorney, Ryan Kelly; Ms. Abraham stated that she did not know with certainty what happened to the hard drive after its transfer. Abraham Dep. at 37-38. Ms. Abraham stated in her declaration that she had personal knowledge of the business systems and procedures used by B2B, as well as B2B's records, "that were preserved contemporaneously at or near the time they occurred, as a matter of course … in the course of our regularly conducted fax broadcasting activities …" Abraham Decl. at 1-2. Ms. Abraham also stated that she was the custodian of B2B's records, which she kept in her personal residence, and that the B2B hard drive was "taken directly from one of B2B's computers for production to [plaintiff's counsel] Anderson + Wanca." *Id.* at 2-3. Joel Abraham testified at his deposition that he had access to B2B's computers when B2B was operating its business and that he gave plaintiff's counsel B2B hard drives in 2009 or 2010.[9] J. Abraham Dep. (July 26, 2011) (Dkt. 216-1) at 15, 34.

Given the testimony of the two Abrahams, this Court finds the hard drive to be properly authenticated to establish the foundation for admissibility under FRE 803(6). Caroline Abraham qualifies as the custodian or a qualified witness with knowledge because she is familiar with B2B's records, which she kept in her personal residence, as well as B2B's record-keeping practices. Any chain of custody problems, such as questions about the handling of the hard drive after it left Joel Abraham's possession, would not defeat authentication under the business records exception. A chain of custody is a "common requirement in authenticating evidence . . . [but] an uninterrupted chain of custody is not a prerequisite to admissibility. Instead, gaps in the

---

[9] Abraham testified, "I handed over disks and hard drive, one or plural, I don't remember how many. Some o[r] all of those media that I handed over were handed personally at a deposition. Some were done by some parcel service or another, and those done by parcel, if I remember, were done directly from me to Plaintiff's counsel or they were through an attorney that I had at the time." J. Abraham Dep. at 35.

chain go to the weight of the evidence, not its admissibility." *Cooper v. Eagle River Mem. Hosp., Inc.,* 270 F.3d 456, 463 (7th Cir. 2001). "Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). Paldo Sign has presented more than enough evidence to make a prima facie showing of genuineness as to the records contained on the hard drive. Other courts addressing the same argument have reached the same conclusion. *See, e.g., Savanna Group, Inc.*, 2013 WL 66181 at *7-8; *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 139-40 (N.D. Ill. 2009).

### iii.    Reliability.

The defendants also take issue with the reliability of the fax transmission logs contained on the B2B hard drive. Dkt. 216 at 12. Notably, however, they have not challenged the admissibility of Mr. Biggerstaff's opinions regarding the number of faxes successfully sent. Instead, they point to the reports of their own experts for the proposition that the plaintiff cannot prove to a certainty that any fax transmissions were actually transmitted successfully. One of the defendants' experts, David Canfield, concluded in his expert report that without the "tracelogs" produced by Hylafax (the software used by B2B), it was impossible to show that any of the transmissions were successful, and that Biggerstaff's reliance on the "xferfax log" to reach that conclusion was problematic. Dkt. 216 at 12-13. Canfield also highlighted the problem of "false positives," made worse by various problems with the Hylafax software and the configuration of the computer system used by B2B. *Id.* at 13. A second defense expert, Ray Horak, explained in his report how fax software, including Hylafax, can malfunction and that the "only true proof of a successful transmission and reception is the physical evidence …." Dkt. 216-3 at 28, 38. Biggerstaff responded with two additional reports, in which he explained, in detail, the ways in

which he specifically excluded from the total number of successful transmissions those transmissions that were not successful; *i.e.*, transmissions that did not result in a positive response from the receiving device. Dkt. 212-8 at 2-22; Dkt. 212-9 at 3-6 ("the logs only record a successful transmission when a positive confirmation is received").

Several courts in this district have rejected virtually identical arguments, holding that the type of records that Paldo Sign is offering are reliable. *See, e.g., C.E. Design*, 259 F.R.D. at 139 (B2B fax records are reliable); *Bridgeview*, 2011 WL 4628744, at *4 (same). At bottom, the defendants' argument that the fax transmission may have resulted in "false positives" is speculation. *See, e.g., Bridgeview*, 2011 WL 4628744, at *4 ("Defendant's speculation about false positives is simply that."). The defendants offer expert reports to suggest the *possibility* of false positives and provide examples of transmissions that *may* have resulted in reports of successful transmissions that were, in fact, unsuccessful. But the defendants offer no concrete evidence that false positives actually occurred, and Biggerstaff vehemently rejects this possibility. Where, as here, the defendant failed to demonstrate that even a single entry in B2B's log was actually inaccurate, there is no occasion to invoke issues of reliability in order to deny certification. *See Turza*, 728 F.3d at 685. Moreover, the defendants make their argument in the context of consideration of numerosity, where to establish that there could be a few false positives mixed in with the data showing *thousands* of successful transmissions accomplishes nothing. To defeat numerosity, the defendants would need to provide some basis to believe that the vast majority of the fax transmissions that were attempted failed yet generated false positives. Their evidence falls far short in that regard.

Any doubt regarding the reliability of the fax records is also resolved by other evidence that buttresses Paldo Sign's assertion of numerosity. That evidence includes Wagener's

deposition testimony that he sent B2B information he wanted to include in the fax, that Wagener wanted to target "people who would be interested in industrial real estate," that Wagener received from B2B instructions regarding how to initiate the fax campaign "immediately upon receipt of your [check] unless you tell us to wait," and that WEI and Wagener sent B2B a check for $668 to send 20,000 advertisements by fax. Dkt. 212 at 2-3. Paldo Sign's evidence also includes Caroline Abraham's deposition testimony that B2B attempted to send over 11,000 faxes on behalf of WEI. Dkt. 212-2 at 169-72. This evidence, and other contextual evidence, supports the conclusion that the fax logs are sufficiently reliable to show that 10,145 faxes were sent on behalf of WEI and Wagener on November 9 and 10, 2006, and that most, if not all, of those fax transmissions were successful.

In short, Paldo Sign has produced enough evidence of the proposed class' size to satisfy numerosity under Rule 23(a)(1). A class of thousands, as proposed here, would be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

### b.     Commonality and typicality.

Under Rule 23(a)(2), "questions of law or fact common to the class" must exist. This requirement is usually satisfied by the existence of a "common nucleus of operative fact," and where the defendants have engaged "in standardized conduct towards members of the proposed class." *See Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The commonality requirement does not, however, "demand that every member of the class have an identical claim. It is enough that there be one or more common questions of law or fact." *Spano v. The Boeing Co*, 633 F.3d 574, 585 (7th Cir. 2011). "The fact that there is some factual variation among the class grievances will not defeat a class action." *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992).

Under Rule 23(a)(3), "the claims or defenses of the representative parties" must also be "typical of the claims or defenses of the class." The Court must determine "whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The representatives' claims are deemed to be typical if they "arise[] from the same event or practice or course of conduct that gives rise the claims of other class members and [their] claims are based on the same legal theory." *Id.* Factual distinctions between the representative parties' claims and the class members' claims do not destroy typicality. *Id.*

As to commonality, the plaintiff's claims plainly arise from a "common nucleus of operative fact"—namely, the events relating to the defendants' distribution of the real estate flyer—and there are plainly a number of issues of fact and law common to the proposed class. Paldo Sign identifies many of them: (1) "the application of the TCPA and applicable FCC rules and regulations"; (2) "whether Defendants' fax was an 'advertisement' as defined by the TCPA"; (3) "the manner and method used to compile or obtain the list of fax numbers to which Defendants' fax was sent"; (4) "whether defendants are vicariously liable for the TCPA violations of B2B"; (5) "whether Defendants obtained the recipients' express permission or invitation to send the faxes"; (6) "whether Plaintiff and the other class members are entitled to statutory damages"; (7) "whether Defendants should be enjoined from faxing advertisements in the future"; and (8) "whether the Court should award treble damages." Dkt. 212 at 8. Further, Paldo Sign alleges that WEI and Wagener engaged "in standardized conduct towards members of the proposed class"—WEI and Wagener ordered a fax broadcast to several thousand fax numbers with the help of B2B. Whether the fax broadcast violated the TCPA is an issue common to the class.

The defendants do not actually argue that there are not common questions of law or fact applicable to the class. Instead, they maintain that the commonality and typicality inquiries usually merge and then focus exclusively on typicality. The link between commonality and typicality just means that "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586. As to typicality, Paldo Sign asserts that its' claims are typical of the other members of the proposed class, who received the same fax on November 9 and 10, 2006. Dkt. 212 at 9. Paldo Sign further asserts that WEI and Wagener made a single payment to B2B to send the fax to thousands of fax numbers. Paldo Sign also asserts that the class members' claims arise from the same legal theory; WEI and Wagener violated the TCPA by sending faxes without the express consent or permission of the recipients. Paldo Sign's claim is indistinguishable from the common claim that it seeks to advance on behalf of the class.

WEI and Wagener assert, however, that typicality is negated by the need for an individualized inquiry into (1) whether each proposed class member has standing under the TCPA; (2) whether each proposed class member consented to receive the fax or was involved in an established business relationship with WEI/Wagener; and (3) how the fax was transmitted and whether the receiving device was a "telephone facsimile machine." Dkt. 216 at 14-24. In short, the defendants seek to repackage the arguments they advanced in objecting to the class definition as challenges to the typicality of the plaintiff's claim.

Changing the packaging of these arguments, however, does not imbue them with additional substantive merit. As to standing and as discussed above, the TCPA does not require the recipient of the fax in question to be the owner of the device that received the fax. *See e.g., Bridgeview*, 2011 WL 4628744, at *3 ("language regarding ownership of the receiving machines

is not required by the Act"). Thus, whether Paldo Sign owned the fax machine to which it was faxed one of the defendant's flyers says nothing about whether its claims are typical of other class members; the claims are not affected by the fact of ownership of the fax machine. The defendants' argument regarding Arnold Chapman—since he was in federal prison at the time the fax was sent, he exemplifies the need for individualized inquiry into standing—also fails. As discussed above, the TCPA prohibits unsolicited advertisements that are *successfully sent*; proof of actual receipt by the intended recipient is not required. Therefore, even the fax sent to Chapman's fax line while he was in federal prison would be actionable under the TCPA; the unique circumstances of his eligibility to be a class member therefore do not defeat typicality. *See De LeFuente*, 713 F.2d at 232 (holding that typicality may be satisfied even if there are factual distinctions between claims of named plaintiffs and other class members).

Second, and as also discussed above in connection with standing, the TCPA is not limited to faxes sent to an actual fax machine. In raising the issue again, the defendants rely not on specific evidence, but on the mere possibility that some putative class members received the fax by means of something other than a "regular telephone line." *See* Dkt. 216 at 23 ("Given the trend towards the use of these types of devices or services, it is likely members of the potential class proposed by Plaintiffs used something other than a regular telephone line . . ."). To make a successful typicality challenge, the defendants must demonstrate, by a preponderance of the evidence, that the plaintiff's claim actually is atypical—not just that it might be. What little evidence the defendants point to actually undermines their argument. They cite Ms. Abraham's testimony for the proposition that B2B used both phone and T1 (internet) lines, but she also testified that "we pretty much kept the Vonage lines [the T1 lines] only for sending our own ads, not our customer's ads," a fact that diminishes substantially the prospect that class members may

have received the defendants' fax via the internet rather phone lines and buttresses Biggerstaff's conclusion that the 10,145 faxes were sent over regular phone lines. The defendants' speculation provides no reason to believe that the plaintiff's claim is atypical in this regard.

Finally, as to consent, it is a defense to the plaintiff's claim and is therefore more appropriately considered in the context of the adequacy of the plaintiff to represent the class. "Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996). Accordingly, the Court turns to the 23(a)(4) discussion of the adequacy of the plaintiff's representation.

### c.      Adequacy of Class Representation.

As the named plaintiff, Paldo Sign must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). He must, among other things, "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002) (citations omitted).

The defendants argue that Paldo Sign is not an adequate class representative because WEI and Wagener have a specific defense to Paldo Sign's claim; Paldo Sign purportedly consented to receive the WEI fax. Dkt. 216 at 25. In particular, the defendants argue that Paldo Sign consented to receive the fax by listing its fax number on its website and advertising the number in a trade directory called *The Blue Book*, although Paldo Sign "claimed ignorance" as to that listing. *Id.* at 25-26. The significance of the defendants' point is that if the class representative's claim is "subject to a defense," "however meritorious the suit itself may be," the class representative is inappropriate if "other class members may not be subject to the same defense, or perhaps to any defense." *See CE Design*, 637 F.3d at 725.

The evidence before this Court, however, indicates that Paldo Sign did not consent to receive the WEI fax. Even if the sender obtains numbers from a third party source, such as a directory, "the sender must take reasonable steps to verify that the recipient consented to have the number listed." *Id.* at 3829. In other words, the fact that a fax number "was made available in a directory, advertisement or website does not *alone* entitle a person to send a facsimile advertisement to that number," although it is a factor to consider in combination with other factors. *Id.* at 3796 (emphasis added); *CE Design Ltd. v. King Arch. Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (consent should be considered on a case-by-case basis and express permission "requires that the consumer understand … she is agreeing to receive faxed advertisements") (citing 18 F.C.C.R. at 14129). Just because Paldo Sign's fax number was listed on its own website and "was made available in a directory … does not alone entitle a person to send a facsimile advertisement to that number." 21 F.C.C.R. 3787, at 3796. "[F]ax numbers are published and distributed for a variety of reasons, all of which are usually connected to the fax machine owner's business or other personal and private interests." 18 F.C.C.R. 14014, 14129. Further, "a company wishing to fax ads to consumers whose numbers are listed in a trade publication or directory must first obtain the express permission of those consumers." *Id.* Paldo Sign did not consent to receive unsolicited fax advertisements by listing its fax number on its own website and by virtue of its fax number being listed in *The Blue Book*. Additionally, the defendants have not shown that they obtained express permission from any intended recipient or from Paldo Sign in particular; in fact Daniel Wagener admitted the opposite.

The Seventh Circuit's decision in *CE Design*, relied on by the defendants, does not affect this conclusion. In that case, the defendant argued that the plaintiff provided express permission to receive fax advertisements by posting its fax number on its website and by signing a form that

"both authorized the publication of its fax number in [*the Blue Book*] … and authorized the other subscribers to the *Blue Book* … to 'communicate' with it, including via fax." 637 F.3d at 725. The president of the plaintiff company testified that he was unaware that by giving the company's fax number to the *Blue Book*, he had expressly authorized faxes to that number. *Id.* at 724. The Seventh Circuit held that "[b]y giving its fax number to the *Blue Book* for publication, [the plaintiff] publicized the number to the *Blue Book's* other subscribers." *Id.* at 726. The court added that the president's testimony "that he was unaware that he had authorized publication" of the company's fax number in the *Blue Book* was difficult to credit and "could be thought [of as] evidence of [his] fear[] that the publication of [the] fax number could indeed be construed as permission to fax ads to that number." *Id.* The court concluded that the "cumulative significance of [the president's] testimony, the publication of [the] fax number in the *Blue Book*, and its publication on [the plaintiff's] website" required the district court to, on remand, consider whether the named plaintiff was an adequate class representative. *Id.* at 726.

The major difference between the plaintiff in *CE Design* and Paldo Sign is that CE Design deliberately signed up for a listing in the *Blue Book*, and Paldo Sign—so far as any evidence shows—did not. Rather, Paldo Sign was "free listed" in the *Blue Book*. Santucci Stmt. (Dkt. 216-8) at 2. "Free listed" means, according to the publication's employees, that the *Blue Book*'s editorial department identified the business, "develop[ed] content," and "[sought] out sources of information" from "any place where construction companies might be listed." Jeff Fandl Dep. (Sept. 16, 2011) (Dkt. 211-1) at 8-10; Douglas Wulkan Dep. (Sept. 16, 2011) (Dkt. 217-2) at 15. Significantly, "free listed" companies are not *Blue Book* customers. Unlike customers, free listed companies do not sign a contract with the *Blue Book* and are not listed in the same area of the publication's online database. Fandl Dep. at 19-21, 23. Thus, in contrast to

the facts in *CE Design,* there is no basis to infer Paldo Sign's consent to receive fax advertisements from its *Blue Book* listing.

As for the defendants' concern about Paldo Sign's credibility, the Court finds nothing inconsistent about the deposition testimony of Madeline Paldo, Paldo Sign's president. The question is whether Paldo's testimony that Paldo Sign did not authorize the *Blue Book* listing, or know how Paldo Sign came to be listed, is inconsistent with a document received from the *Blue Book* pursuant to a subpoena in this lawsuit. Paldo Dep. (Mar. 28, 2013) (Dkt. 212-7) at 34-35. The *Blue Book* document states,

> This company was created in our database in 1989 and is currently free listed … The company information was last updated on January 11, 2013 by our Data Communication Department via the phone … Per our Editor, free listed customers are verified (the information that we have is checked) every year, if possible.

Dkt. 216-8 at 2. There is nothing inconsistent about Paldo's testimony. The *Blue Book* document does not affirmatively show that Paldo Sign authorized the listing or even that the update sought by phone on January 11, 2013 was made with any knowledge on Paldo Sign's part of the phone call's purpose. The fact that the "company was created in our database" also demonstrates nothing about Paldo Sign's intentions, and certainly does not show that "Paldo activated its Blue Book listing voluntarily in 1989" as the defendants assert. Dkt. 216 at 26. Madeline Paldo's inability to remember this single detail, if she ever knew it, and if it was ever true, does not call into question Paldo Sign's credibility.

The Court therefore concludes, on the basis of the present record, that Paldo Sign did not consent to receive WEI's fax and is not disqualified as an adequate class representative on that basis.

**d.  Adequacy of Class Counsel.**

The class is represented by Boch & Hatch and Anderson & Wanca. Counsel should show that "they would prosecute the case in the interest of the class … rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts." *Creative Montessori Learning Ctr. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011). The Court will consider the class counsel's integrity and capacity to be "conscientious fiduciaries of the class." *Id.* at 918. If "misconduct by class counsel … creates a serious doubt that counsel will represent the class loyally," class certification should be denied. *Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 495 (7th Cir. 2013). Further, "[a]nything pertinent to counsel's ability to fairly and adequately represent the interests of the class bears on the class certification decision." *Id.* at 498 (quoting Fed. R. Civ. P. 23(g)(1)(B)).

Anderson & Wanca has been the subject of considerable scrutiny in this Circuit for its questionable tactics in obtaining B2B's records. *See Reliable Money Order*, 704 F.3d at 491-92 (collecting cases in the Northern District of Illinois). Anderson & Wanca has filed over one hundred class actions under the TCPA, "all rooted in data recovered from the B2B disks and hard drive." *Id.* at 493. But the Seventh Circuit put the issue to rest in *Reliable Money Order* in which it concluded that "although distressed" by Anderson & Wanca's tactics, "we do not believe those lapses in professionalism" require denial of class certification. *Id.* at 499.[10]

---

[10] The Seventh Circuit in *Reliable Money Order* addressed but did not decide whether the questionable attempted payment of $5,000 by Anderson & Wanca to Caroline Abraham's attorney would render class counsel inadequate. 704 F.3d at 501 ("if proven, [this] would require denial of class certification"). However, in later cases in this district, the $5,000 payment was found not to render Anderson & Wanca inadequate because the record did not demonstrate that Anderson & Wanca sent the payment with an inappropriate motive. *See, e.g., Savanna Group*, 2013 WL 626981, at *6. WEI and Wagener have not offered any such evidence in this case. The Court therefore concludes that the $5,000 payment does not render class counsel inadequate.

The defendants offer one additional point in an effort to show the inadequacy of class counsel. WEI and Wagener argue that Anderson & Wanca contacted WEI directly in April 2012 to "invite[] WEI to participate in a TCPA class action." Dkt. 157-1 (Wagener Aff.); Dkt. 216 at 27. The defendants argue that the "solicitation letter" shows a "lack of due diligence" because "Plaintiffs' counsel is soliciting an entity it has sued under the TCPA to participate in a TCPA matter." Dkt. 216 at 27. The Court agrees with Paldo Sign; the document in question is a "Notice of Pending Class Action," not a "solicitation letter." Dkt. 157-1. The document does not hope to "tap" a "reserve of potential litigants," such as the solicitation letter at issue in *Reliable Money Order*. 704 F.3d at 492-93 (letter at issue stated "My law firm pursues class action lawsuits … During our investigation, we have determined that you are likely to be a class member … We would like to discuss this issue with you. Please call me at [phone number] or send an email to [email address]."). Rather, the document relates to a separate class action in which the recipient was potentially a member of the class defined in the notice. Defendants' objection is therefore insufficient to render class counsel inadequate for the purposes of this lawsuit.

### e.    Predominance.

Paldo Sign must also demonstrate that "questions of law and fact common to class members predominate over any questions affecting only individual members" of the class. Fed. R. Civ. P. 23(b)(3). This requirement is satisfied "when common questions represent a significant aspect of [a] case and can be resolved for all members of [a] class in a single adjudication." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).

The defendants argue that Paldo Sign has failed to show predominance with regards to standing, consent, and the nature of the receiving device.[11] These arguments have been addressed and rejected in detail above. The class members' claims arise under the same federal statute, the TCPA. Further, Paldo Sign has presented evidence that B2B successfully sent the fax in two distributions to 10,145 recipients. The class members' claims relate to each member's receipt of the same fax from WEI and Wagener on November 9 and 10, 2006.[12] Although WEI and Wagener dispute that they ultimately authorized B2B to send the faxes, and also dispute whether the fax constitutes advertising, those questions are also common to the class and central to determination of the claims of the class members. Moreover, the absence of evidence suggesting that a substantial number of class members consented in some fashion to receipt of the defendants' fax or received the fax via internet rather than phone line means that there is little reason to believe that such issues will overwhelm common questions going forward. Predominance, in any event, is a qualitative, not quantitative assessment, and the defendants

---

[11] Citing just two cases decided in 2011, the defendants make the questionable claim at the outset of their argument concerning predominance that "the recent trend" in Illinois district courts has been to deny class certification motions in TCPA cases for failure to satisfy the predominance and superiority requirements of Rule 23(b)(3). Dkt. 216 at 28. The defendants simply ignore the many cases decided during and since 2011 in which TCPA classes have been certified, as well as the Seventh Circuit's observation in *Turza* that class certification is the norm in TCPA cases. *See, e.g., Saf-T-Gard Intern., Inc. v. Vanguard Energy Servs., LLC*, No. 12 C 3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012) (certifying class in TCPA action); *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2011 WL 4628744 (N.D. Ill. Sept. 30, 2011) (same); *Mussat, M.D., S.C. v. Global Healthcare Resource, LLC*, No. 11 C 7035, 2013 WL 1087551 (N.D. Ill. Mar. 13, 2013) (same); *The Savanna Group v. Truan*, No. 10 C 7995, 2013 WL 626981 (N.D. Ill. Feb. 20, 2013) (same); *Creative Montessori Learning Ctr. v. Ashford Gear, LLC*, No. 09 C 3963, 2012 WL 3961307 (N.D. Ill. Sept. 10, 2012) (same).

[12] The Court acknowledges that there were two slightly different faxes sent out on behalf of WEI and Wagener. After it was discovered that the opt-out number listed on the initial fax was incorrect, the opt-out number was adjusted and the faxes continued to be sent. Dkt. 212-13 (Biggerstaff Supp. Rpt.) at 4. The adjustment to the opt-out number is not enough to change the Court's conclusion that common questions of fact predominate; the different numbers are immaterial to any issue in the case.

have identified no basis to believe that this case will be different than the "normal" § 227 class action in which the common issues arising from the near-simultaneous transmission, by the same defendant, of the same unsolicited fax predominate over potential distinctions between a small portion of the class. Paldo Sign, therefore, has demonstrated predominance under Rule 23(b)(3).

### f.    Superiority.

To satisfy superiority, Paldo Sign must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Four factors are relevant: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

A class action is superior to other methods of adjudicating this class's TCPA claims. There are up to 10,145 plaintiffs in this suit with the same claim under the same federal statute. With that large number in mind, it is impossible to imagine individual lawsuits; disposition by class action is certainly, in this case, an efficient use of judicial resources. Further, since the statutory recovery is the greater of $500 or "actual monetary loss," individual plaintiffs have a low incentive to bring a lawsuit on their own behalf. 47 U.S.C. § 227(b)(3)(B); *see Pastor v. State Farm Mut. Auto Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007) ("small recoveries do not provide the incentive for any individual to bring a solo action"). In conclusion, a class action is superior to allowing individual lawsuits.

For the reasons discussed above, Paldo Sign has met the requirements for class certification under Rule 23.

### B. Daniel Wagener's Motion to Dismiss

In his Motion to Dismiss the Second Amended Class Action Complaint (Dkt. 200), Daniel Wagener puts forth two arguments for the dismissal of Paldo Sign's claims against Wagener as an individual. First, Wagener argues that the TCPA count should be dismissed because Paldo Sign failed to allege that Wagener was a corporate officer of a blast faxing corporation or that he was personally involved in the faxing of the WEI fax. *Id.* at 2-4. Second, Wagener argues that the state law counts should be dismissed because Paldo Sign failed to allege Wagener's active involvement in the fax transmission. *Id.* at 4-5. For the reasons discussed below, Wagener's Motion to Dismiss is denied as to both the TCPA count and the two state law counts.

A federal complaint must present "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly,* 550 U.S. 544, 570 (2009)). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

As an initial matter, Paldo Sign argues that Wagener's motion should be denied because in July 2010, Judge Norgle granted the plaintiff's motion for leave to file a first amended class action complaint, which added Daniel Wagener as a defendant. Dkt. 22, 33. This argument is misguided. After Judge Norgle's decision, the parties engaged in discovery, including the plaintiff's deposition of Daniel Wagener; several additional facts regarding Wagener's involvement in the WEI fax were brought to light. Further, Wagener was permitted to respond to the plaintiff's attempt to name him as a defendant in 2010, and he is now permitted to seek dismissal—under a separate standard—of the claims listed in the plaintiff's subsequent amended complaint. The Court will therefore turn to the motion.

### 1. Paldo Sign Pleads a Sufficient Basis for Wagener's Liability Under the TCPA.

The TCPA prohibits "any person" from using a fax machine, computer, or other device "to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227 (b)(1) and (b)(1)(C). Here, Paldo Sign has sued Wagener Equities, as well as Daniel Wagener, the president of Wagener Equities. Dkt. 190 at 3; Wagener Dep. at 6 (Dkt. 212-1). In his Motion to Dismiss, Wagener counters that Wagener cannot be liable under the TCPA because Paldo Sign failed to allege that Wagener was "personally responsible" for sending the WEI fax. Dkt. 200 at 4.

Wagener misinterprets the reach of the TCPA. The plain language of the statute supports the proposition that "any person" applies to individuals as well as corporate entities. *See, e.g., Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 (D. Md. 2011) ("the 'any person' language … plainly applies to individuals; the section does not impose liability only on entities"). Although there is no case law on point within the Seventh Circuit, there is ample precedent from other courts finding individuals personally liable, along with their companies, for TCPA violations. *See, e.g., Creative Montessori*, 2010 WL 3526691, at *3 (N.D. Ill. Sept. 10, 2012) (finding sufficient allegations of individual violation of TCPA where employee "created the majority of the unsolicited facsimile advertisements [and] corresponded directly with [B2B]"); *Maryland*, 787 F. Supp. 2d at 417 (D. Md. 2011) (finding owner and employee of company personally liable under TCPA because they were directly involved in TCPA violations); *Versteeg v. Bennett, Deloney & Noyes, P.C.*, 775 F. Supp. 2d 1316, 1321 (D. Wy. 2011) (finding head of collections and information technology unit liable under TCPA because he was directly involved in conduct that violated TCPA); *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001) (finding president and vice president liable under TCPA

because they were the "guiding spirits" and "central figures" behind the TCPA violations). These courts agree that "individuals acting on behalf of a corporation may be held personally liable for violations of [the TCPA] if they had 'direct, personal participation in or personally authorized the conduct found to have violated the statute.'" *Maryland*, 787 F. Supp. 2d at 415 (quoting *Texas v. Am. Blastfax*, 164 F. Supp. 2d at 898). None of these cases, as Paldo Sign points out, requires an allegation that Wagener was the individual who personally hit the "send" button on a fax machine. In fact, the "sender" under the TCPA is "the person or entity on whose behalf the advertisement is sent," not the individual or entity that *actually* operates the transmitting fax machine. 21 F.C.C.R. 3787, at 3808. The "entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." 10 F.C.C.R. 12391, 12407 (FCC 1995); *see also Bridgeview*, 2011 WL 4585028, at *4 ("[D]efendants cannot escape liability simply by hiring an independent contractor to transmit unsolicited facsimiles on their behalf."). Also pertinent is the decision in *Fed. Trade Comm'n v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005), in which the Seventh Circuit held that if a corporation violates the Federal Trade Commission Act, individual officers are also liable if they "participated directly in the deceptive acts or practices or had authority to control them." *Id.* at 764. With this persuasive and analogous authority in mind, the Court turns to the facts at issue and the critical question of whether Daniel Wagener had sufficiently direct and personal participation in the TCPA violation Paldo Sign alleges.

In its Second Amended Complaint, Paldo Sign alleged that Wagener "approved, authorized and participated in the scheme to broadcast advertisements by facsimile by (a) directing a list to be purchased or assembled; (b) directing and supervising employees or third parties to send the advertisements by fax; (c) creating and approving the form of advertisements

to be sent; (d) determining the number and frequency of the facsimile transmissions; and (e) approving or paying the employees or third parties to send the advertisements by facsimile transmission." Dkt. 190 at 3. These allegations, assumed to be true for purposes of the motion to dismiss, suffice to plausibly show direct, personal participation, as well as authorization, of the WEI fax. The dispute as to whether Wagener and Wagener Equities ultimately gave permission to B2B to send the fax is irrelevant in the context of Wagener's motion to dismiss, both because the Court is required in this context to accept the truth of the plaintiff's version of events and because Wagener in any event participated directly in events leading up to the fax transmission.

Wagener himself admitted much of his personal involvement at his deposition. *See, e.g.,* Wagener Dep. at 15 ("This outfit, this Market Research … contacted me."); 27 ("all I knew was that they could send out … faxes … whatever amount you wanted"); 30 ("They were going to work up something and send it to me"); 37 ("I provided them with something that I had worked on"); 47 ("I probably did [review the agreement]"); 48 (targets of faxes were "people who would be interested in industrial real estate or have a need for industrial real estate only"); 49 ("Did you instruct Dennis to write a check to The Marketing Research Center? Yes."); 50 ("Writing checks would be Dennis. Approving them would be me."); 50 ("we were supposed to send them a check, fax them a check"); 54 ("I believe I did [fax a copy of the check]").

It is of course the case that officers or employees are generally not liable for statutory violations based solely on their employment status. *See, e.g., Savanna Group,* 2013 WL 4734004, at *8 (finding head of marketing not liable under TCPA because allegations were based solely on his status and would run afoul of the principal that a corporate officer may not be liable for corporate acts based purely on his status in corporation). But that is not this case. Here, Daniel Wagener was the main contact at WEI for B2B (a.k.a. Marketing Research Center), he

drafted the fax himself, he provided the fax to B2B, and he instructed another employee to send B2B payment for the fax. He was directly and personally involved, and therefore he can be held liable under the TCPA.

> ### 2. Paldo Sign Pleads a Sufficient Basis for Wagener's Liability Under the State Law Claims.

Wagener's potential liability under the state law claims—conversion and under the Illinois Consumer Fraud and Deceptive Business Practices Act—follows the same logic. In Illinois, corporate officers are personally liable for the torts of the corporation if the officer actively participated in the tort. *See Nat'l Acceptance Co. of Am. v. Pintura Corp.*, 94 Ill. App. 3d 703, 706 (1981) (citations omitted) ("a corporate officer may be liable for … conversion"); *see also, e.g., GMAC, LLC v. Hillquist*, 652 F. Supp. 2d 908, 921 (N.D. Ill. 2009) (citing *Nat'l Acceptance*) ("corporate officers are personally liable for the torts of the corporation if the officer actively participated in the tort").[13]

Paldo Sign has alleged sufficient facts to state a claim for relief for conversion and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act by Wagener. In particular, Paldo Sign alleges that Wagener directed and supervised a third party to send the fax, drafted the fax, and approved the payment to the third party to send that fax. Dkt. 190 at 3. Wagener's deposition testimony further supports these allegations. Although Wagener disputes that he ultimately authorized B2B to send the fax, this Court must take Paldo Sign's alleged facts as true for the purpose of deciding the present motion, and Paldo Sign has alleged that Wagener did, in fact, authorize B2B to send the fax. In sum, Paldo Sign's allegations that Wagener was an

---

[13] This is not a question of piercing the corporate veil; that involves derivative liability. *See, e.g., Forsythe v. Clark USA, Inc.*, 361 Ill. App. 3d 642, 649 (1st Dist. 2005) (distinguishing between direct participant liability and veil piercing and other types of derivative liability cases). The question here is whether Wagener can be held directly liable for these torts, based on his own conduct.

active participant in the development, payment, and approval of the WEI fax are sufficient to state a claim for relief under the two state law claims.

*     *     *

For the reasons set forth above, the Motion for Class Certification is granted and Daniel Wagener's Motion to Dismiss is denied.

Entered: February 11, 2014

_____
John J. Tharp, Jr.
United States District Judge