# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| PALDO SIGN AND DISPLAY COMPANY, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 09 C 07299 |
| WAGENER EQUITIES, INC. and DANIEL WAGENER, | ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the plaintiffs' Motion for Partial Summary Judgment in a TCPA junk fax case. For the reasons explained below, the plaintiffs' motion is granted in its entirety.

### I. BACKGROUND

In February 2014, this Court granted the plaintiffs' Motion for Class Certification and denied defendant Daniel Wagener's Motion to Dismiss. The class definition that the Court certified was:

> All persons who were successfully sent a facsimile from "Wagener Equities" on November 9, 2006, or November 10, 2006, stating that people "Looking for Industrial Property" should "Go To: www.FindIndustrialRE.com."

The Court appointed Paldo Sign & Display Company as the representative of the class. On March 31, 2014, the Seventh Circuit denied the defendants' motion for leave to appeal the class certification. *See Chapman et al. v. Wagener Equities, Inc., et al.*, 747 F.3d 489 (7th Cir. 2014). The plaintiffs have now filed a motion for partial summary judgment.

The Court assumes familiarity with the background that was set forth in detail in its opinion certifying the class and denying Wagener's motion to dismiss. *See Chapman v. Wagener Equities, Inc. and Daniel Wagener*, No. 09 C 7299, 2014 WL 540250 (N. D. Ill. Feb. 11, 2014). This opinion addresses only the facts relevant to resolving the present motion, which are taken from the parties' Local Rule 56.1 statements and responses. Only facts that this Court deems material and supported by admissible evidence are included.

The plaintiff class alleges that the defendants violated the Telephone Consumer Protection Act ("TCPA"), which makes it unlawful for any person "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless, among other conditions, (1) the "unsolicited advertisement is from a sender with an established relationship with the recipient" *and* (2) the sender obtained the fax numbers through that established business relationship or from a directory, advertisement, or site on the web to which the recipient voluntarily agreed to make its fax number available for public distribution. 47 U.S.C. § 227(b)(1)(C), (b)(1)(C)(i), (ii). Specifically, the plaintiffs allege that Wagener Equities, Inc., an Illinois corporation involved in commercial real estate, and its president, Daniel Wagener (collectively "WEI"), directed a company named Business to Business Solutions (B2B) to fax an advertisement to thousands of fax numbers, and that 10,145 different fax numbers received the fax on November 9 and 10, 2006, without the recipients' consent and in violation of the TCPA. Defs. 56.1 Resp. (Dkt. 242) ¶¶ 9, 10, 45.

**B2B and Macaw:** The parties devote substantial energy to debating the respective roles, and relationship, of two businesses: Business to Business Solutions ("B2B") and "Macaw," in sending the fax that is at issue in this case. The plaintiffs allege that an individual named Carolyn Abraham, while operating B2B, was involved in fax advertising from August 2005 until

September 2007. *Id.* ¶ 11. B2B approached potential customers and those customers provided draft advertisements designed by the customers themselves. *Id.* ¶¶ 15-16. WEI admits that Abraham and B2B "assisted" with the alleged fax broadcasting, but denies that Abraham and B2B "managed the substantive portions of any alleged fax advertising." *Id.* ¶¶ 11, 13. Rather, WEI asserts, the "substantive portions" of the fax advertising business "were managed and controlled by a Romanian entity known as Macaw." *Id.* ¶¶ 11, 13. According to WEI, it was Macaw's independent contractors who communicated directly with customers and controlled the alleged fax transmissions. *Id.* ¶¶ 15-16, 19.

The debate is not directly relevant to the question of WEI's potential liability, but to the question of the admissibility of evidence regarding the transmission of the fax at issue. WEI denies that Abraham (or her son, who assisted her in the business) can authenticate any of the transmission data on which the plaintiffs rely because she has no personal knowledge regarding the fax broadcasting business that is alleged, and also denies that Abraham was personally involved in sending the fax transmissions at issue in this case, communicating with Wagener or anyone else at WEI, sending faxes to prospective clients, maintaining computers used by B2B, removing the hard drive at issue, backing up any B2B data, or compiling lists of fax recipients. *Id.* ¶¶ 17-18; Pls. 56.1 Resp. (Dkt. 248) ¶ 8. WEI adds that Macaw controlled Abraham's computers, and all faxing activity, remotely; the plaintiffs counter that faxes were only sent after Abraham gave instructions to Macaw, including what was to be faxed and when and where it was to be faxed. Pls. 56.1 Resp. ¶ 5. The plaintiffs assert that B2B and Macaw "were engaged in a joint business effort to obtain customers for their fax broadcasting endeavor … Simply put, the efforts of B2B-Abraham and Macaw were inextricably intertwined as one business operation." *Id.* ¶ 8.

The plaintiffs also state that B2B marketed itself as "Maxileads" or "Marketing Research Center," but WEI denies this fact, asserting instead that "Maxileads" and "Marketing Research Center" were "letterhead" names and not actual companies or entities. Defs. 56.1 Resp. ¶ 12.

**Wagener's Alleged Fax Order:** At some point prior to November 7, 2006, Daniel Wagener spoke to an individual on the telephone about "fax broadcasting services." *Id.* ¶ 21. The plaintiffs claim that this individual was associated with B2B; WEI claims that the individual—who used the false name "Kevin Wilson," but whose name is actually Connor Melville (this opinion will refer to him as Wilson since that is the name he allegedly used)—was not a representative or employee of B2B and "represented himself to be associated with the Marketing Research Center." *Id.* ¶ 21-22. Wagener spoke to Wilson about sending faxes to "people who would be interested in industrial real estate or have a need for industrial real estate" in Cook, Lake, and DuPage Counties. *Id.* ¶ 23. Wilson sent Wagener some sample advertisements and then sent his own draft advertisement to Wilson. *Id.* ¶ 24-25.

Next, Wilson sent Wagener a document describing the process for ordering a fax advertisement, which included detailed instructions to (1) write a check for $668 payable to B2B; (2) make a copy of the check; (3) mail the check to B2B; (4) write on the check copy page, "I have already mailed this check!;" and (5) fax the check copy and note to B2B. *Id.* ¶ 27. The instructions also stated, "We will start your marketing campaign immediately, if you fax us a copy of our payment check after you mail it;" "To begin your program immediately, follow these simple instructions;" and "Although we will start your campaign immediately upon receipt of your fax (*unless you tell us to wait*), we will not deposit your payment until after we have transmitted your messages." *Id.* (emphasis added). The instructions further stated, "<u>IMPORTANT</u>: We are trusting your word, but we can only transmit your messages

immediately if your check copy is received WITH your signed declaration that the check has already been mailed." *Id.* (emphasis in original).

The plaintiffs claim that Wagener followed these instructions and consequently ordered, and gave permission to transmit, 20,000 advertising faxes for $668.00. *Id.* ¶ 26. WEI denies this fact. *Id.* WEI admits that Wagener instructed the vice president of WEI to write a check to B2B "as a showing of good faith in order to obtain the list of proposed recipients from 'Mr. Wilson.'" *Id.* ¶ 28(a). WEI denies, however, that it ever paid B2B, "as payment was stopped on the identified check as soon as WEI determined that faxes may have been sent without their authorization." *Id.* ¶ 28(b). WEI also admits that the check at issue contained the word "ads" under the word "description," but denies that this was a reference to "faxes" or that it described "faxes" as "ads." *Id.* ¶ 28(b). WEI concedes that "it is possible" that Wagener faxed a copy of the check at some point in time, but denies that the fax included a handwritten note stating "I have already mailed this check!" (although WEI admits that the exhibit does contain this note). *Id.* ¶ 28(d), (e). Significantly, WEI asserts that Wagener "told 'Mr. Wilson' to wait and told him that nothing should be sent or done prior to Mr. Wagener receiving and reviewing the list of potential recipients." *Id.* ¶ 29. The plaintiffs counter that Abraham testified that she did not recall hearing from Macaw salespeople that the WEI fax should not begin until Wagener reviewed the recipients' list; WEI responds that not all instructions from clients were memorialized and communicated to Abraham. *Id.* ¶¶ 31-32.

**The Fax:** A copy of the fax that was allegedly sent on behalf of WEI is set forth below:

> **Looking for Industrial Property?**
>
> Search the most complete Chicago area
> Property Database for – FREE
>
> Go To:
>
> **www.FindIndustrialRE.com**
>
> Searching on the site is simple, quick, and will get you up to speed on the prices and available properties in your area.
>
> This information is provided as a courtesy of Wagener Equities, Inc. Our clients frequently go to this site as a tool to educate themselves on the industrial real estate market.
>
> Regards,
> WAGENER EQUITIES, INC.
>
> *Daniel R. Wagener*
> Daniel R. Wagener, SIOR, CCIM
> President
> Phone   (847)816-2621
> Fax      (847)816-6045
>
> If you received this fax in error and would like to be removed from our database, call toll free 1-800-511-8943

It is undisputed that WEI owns the website address www.FindIndustrialRE.com, and maintains the industrial database found on that site. WEI asserts, however, that the website is "only a database that includes all available industrial properties in Illinois, including those for which WEI does not have an exclusive listing." *Id.* ¶¶ 37-38, 41.

**Transmission of the Fax:** According to the plaintiffs, the fax was successfully sent to 10,145 different fax numbers, which were obtained from a list B2B purchased from InfoUSA. *Id.*

6

¶¶ 35, 45. WEI "denies that any number of faxes were successfully transmitted in this matter." *Id.* ¶ 35. In fact, the parties hotly contest the content, nature, and ownership of a hard drive containing data that may or may not reflect transmissions of the alleged faxes at issue. The plaintiffs assert that B2B used a computer-based fax broadcasting software application, called HylaFAX, to send the faxes. *Id.* ¶ 14. WEI essentially denies this fact, asserting instead that the plaintiffs' expert, Robert Biggerstaff, found only that the hard drive at issue "contained multiple partitions … [with] several references to 'HylaFAX.'" *Id.* ¶ 14. WEI also asserts that Biggerstaff had no personal knowledge as to whether the hard drive he reviewed—and from which he concluded there were 10,145 successful transmissions of the WEI fax—actually came from B2B. *Id.* ¶ 45. WEI further contests another plaintiffs' expert's assertion that he knew "of no circumstance where HylaFAX will report a fax as being successful when it was not." *Id.* ¶ 52.

Separately, WEI asserts that the hard drive "does not contain a 'log' directory including 'tracelog' files," a fact the plaintiffs admit. Pls. 56.1 Resp. ¶ 16. WEI explains that a fax cannot be determined to have been successfully sent "with a reasonable degree of technical certainty" if there are no "tracelog" files on the hard drive, because the "tracelog" files contain more detailed information than the Hylafax "xferfax" log files. *Id.* ¶¶ 19, 21.

**Consent:** The plaintiffs claim that B2B never contacted any of the recipients of the alleged fax to ask them for permission to receive a fax. Defs. 56.1 Resp. ¶ 57. WEI admits this fact, but asserts that B2B believed that WEI had an existing business relationship with all individuals on the InfoUSA list. *Id.* WEI adds that WEI was told by Wilson that only companies

with which WEI had an existing business relationship or that had agreed to receive faxes would be included on the list of potential recipients. *Id.* ¶¶ 58.[1]

## II. ANALYSIS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See Jajeh v. Cnty. of Cook,* 678 F.3d 560, 566 (7th Cir. 2012) (citing Fed. R. Civ. P. 56(a)). In addressing the plaintiffs' motion, the Court must construe all facts and draw all reasonable inferences in the defendants' favor. *Id.* If the moving party demonstrates the absence of a disputed issue of material fact, then "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch,* 698 F.3d 561, 564 (7th Cir. 2012).

The plaintiffs move for partial summary judgment on three elements of their TCPA claim: (1) the fax was an "advertisement" as defined by the TCPA; (2) the fax was successfully sent by a telephone facsimile machine, computer or other device to 10,145 different fax numbers; and (3) the faxes were sent without the recipients' prior express invitation or permission to do so. The Court grants the plaintiffs' motion for summary judgment as to all three elements—(1) the fax was an "advertisement" as a matter of law; (2) the fax was successfully sent to 10,145 different fax numbers; and (3) the faxes were was sent without the recipients' consent.

---

[1] Wilson "stated orally and documents provided by him also stated that faxing only occurred when there was an existing business relationship and businesses had agreed to receive faxes." *Id.* ¶ 63.

## A. The WEI Fax is an Advertisement as a Matter of Law.

The TCPA defines an "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services …." 47 U.S.C. § 227(a)(5).

The plaintiffs argue that there is no dispute that the fax at issue was an advertisement because WEI's purpose was to "advertise the availability or quality of Defendants' industrial real estate investment management, leasing and sales services and properties." Pls. Mem. (Dkt. 233) at 7. The plaintiffs note that Daniel Wagener testified at his deposition that the "intended targets" of the faxes were

> industrial users … people who would be interested in industrial real estate … The party who would go on this site, if they found something of interest and … freely looked at the information and said I want more information and contacted my office, they would contact me or my office. If they decided to work with us and said I'm looking for a space … then we maybe can work with them and ultimately sell or lease a building to them, potentially.

Pls. 56.1 Resp. ¶ 35. In its February 2014 opinion, this Court did not resolve the question of whether the fax was an advertisement, but it did note that Wagener's deposition testimony reflected that Wagener hoped the fax would bring some commercial benefit to Wagener Equities. Feb. 11, 2014 Mem. Op. at 14 n.7.

WEI asserts that two pages of the fax were unrelated to WEI. Defs. Mem. (Dkt. 243) at 10. The plaintiffs respond that the lawsuit does not pertain to the first two pages of the fax, but rather focuses on the third and final page of the fax, which does pertain to WEI. As to the third page, WEI argues that it "does not promote a commercial service of WEI." Rather, the fax "itself states that it is provided as a courtesy" and "simply provides a link to an informational website that provides no ability to buy a WEI product or service, provides no financial remuneration to WEI as a result of a sale or lease of a property from that website, and contains information that is not specific to WEI." Defs. 56.1 Resp. ¶ 35; Pls. 56.1 Resp. ¶ 32. WEI also denies that the

website "guaranteed any type of listing agreement or financial gain for WEI." Pls. 56.1 Resp. ¶ 43.

Advertising the availability of services is covered by the TCPA. In *Holtzman v. Turza*, the Seventh Circuit held that a fax contained an "advertisement" as defined by the TCPA because although it did not "tout[] the quality of" services, it "did declare their availability." 728 F.3d 682, 685 (7th Cir. 2013). The fax at issue "devote[d] about 75% of the space to mundane advice and the remainder to [the defendant's] name, address, logo, and specialties." *Id.* at 686. The court noted that the TCPA "does not ask whether a notice of availability is incidental to something else" and that "*any* material advertising the commercial availability or quality of any property, goods, or services" is an "advertisement" under the TCPA. *Id.* at 687 (citing 47 C.F.R. § 64.1200(f)(1)) (emphasis added). Concluding that "promotion or marketing was the reason these faxes were transmitted," the court found the fax to be an advertisement as a matter of law. *Id.* at 688.

Similarly, there is no genuine dispute of material fact that the fax here advertises the commercial availability of WEI's services—a free database of industrial real estate listings that is owned and managed by WEI. As Wagener himself acknowledged, the purpose of the fax was to direct traffic to WEI's database. Once there, Wagener hoped recipients would use the database to find industrial properties that would meet their criteria; the recipients would then, Wagener expected, contact WEI about those properties. The fax is therefore an "advertisement" under the TCPA as a matter of law.

### B. The WEI Fax was Successfully Sent to 10,145 Fax Numbers.

In examining whether the class was sufficiently numerous, this Court held in its February 2014 opinion that the hard drive at the center of this case was properly authenticated to establish the foundation for admissibility under FRE 803(6). This Court further held that the fax

transmission logs contained on the hard drive were sufficiently reliable to show that 10,145 faxes were *sent* on November 9 and 10, 2006 and that "most, if not all, of those fax transmissions were successful," meaning the faxes were received by the recipients. Feb. 11, 2014 Mem. Op. at 22. Consequently, this Court found that the plaintiffs showed numerosity.

The question now before the Court is whether the WEI fax was—without factual dispute—*successfully* sent to all 10,145 fax numbers. WEI again calls into question the source of the hard drive and the source of the data on that hard drive, but the Court has already ruled that the plaintiffs established an adequate foundation to admit this evidence. *Id.* at 19-20 ("this Court finds the hard drive to be properly authenticated to establish the foundation for admissibility under FRE 803(6) … Paldo Sign has presented more than enough evidence to make a prima facie showing of genuineness as to the records contained on the hard drive."). And based on this evidence, the plaintiffs' expert, Biggerstaff, opined that 10,145 faxes were "successfully sent," meaning that the faxes were "sent to and received by equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." Biggerstaff Nov. 15, 2010 Report (Dkt. 212-3) at 6.

The plaintiffs having adduced admissible evidence in support of their position, the defendants are required to adduce contrary evidence in order to demonstrate that there is a material question of disputed fact regarding the successful transmission of the faxes. *See* Local Rule 56.1(b)(3)(B) (requiring that a party opposing summary judgment properly set forth their challenge by citing the "specific references to the affidavits, parts of the record, and other supporting materials relied upon."); *see also Carroll v. Lynch*, 698 F.3d 561, 566 (7th Cir. 2012) (where non-movant offered no evidence of specific facts contradicting or undermining the movant's conclusion, no genuine dispute of material fact exists; "neither a desire to cross-

examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment.") (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983)). In an effort to adduce contrary evidence, the defendants offer their own expert witnesses, who conclude that "it cannot be demonstrated that any number of faxes have been 'successfully sent'" because the hard drives did not include "tracelogs," which, according to the defendants, would provide a more definitive record of successful or unsuccessful fax transmissions (because the trace logs show a full file structure and the "xferfax" logs do not). Without these tracelogs, the defendants argue, false positives are conceivable and therefore it cannot be said with certainty that all 10,145 transmissions that Biggerstaff identified were successfully sent. Defs. Mem. at 12-14.

This evidence does not meet the defendants' burden in opposing summary judgment. In opposition to Biggerstaff's testimony, the defendants offer only speculation that it is possible that some of the faxes were not actually transmitted. Even putting aside the fact that Biggerstaff testified that he excluded from his number unsuccessful transmissions of the fax, speculation is not sufficient to counter hard evidence. *See Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 112 (7th Cir. 1990) ("Speculative statements are not sufficient to counter affidavits and other evidence put forward by the moving party.") (citation omitted); *Steinhauer v. DeGolier*, 359 F.3d 481, 485 (7th Cir. 2004) ("mere speculation … cannot defeat summary judgment."). And indeed, numerous courts have rejected this line of argument by similarly situated defendants seeking to discredit Biggerstaff's analysis of the transmission records of other B2B fax blasts. *See, e.g.*, *American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, No. 13-2605, 2014 WL 3317736, at *4 (6th Cir. July 9, 2014) (in affirming grant of class certification and summary judgment, noting that defendant's argument that the transmission data analyzed by Biggerstaff

could be erroneous is "wholly speculative"); *Turza,* 728 F.3d at 685 (noting that the defendant offered no reason to think transmissions were recorded inaccurately); *Savanna Group, Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 66181, at *5 (N.D. Ill. Jan. 4, 2013) (in granting class certification, confirming position that Biggerstaff's analysis showed successful and error-free transmissions); *CE Design Ltd. v. Cy's Crabhouse North, Inc.*, 259 F.R.D. 135, 139 (N.D. Ill. 2009) (holding that Biggerstaff's opinion that error-free entries indicated successful transmissions was sufficiently reliable and admissible for class certification). As the Seventh Circuit explained in *Turza*, in the absence of contrary evidence, the electronic confirmation of receipt by the receiving machine suffices to prove successful transmission and the mere possibility of error in such confirmation "would not permit reasonable jurors to reject the fax log." 728 F.3d at 685.

### C. The Fax was Sent without the Recipients' Consent.

The TCPA contains three important exceptions—there can be no TCPA violation (1) where the advertisement is from a sender[2] with an "established business relationship" with the recipient; (2) where the sender obtained the fax number through a voluntary communication of the number within the context of an established business relationship; or (3) where the sender obtained the fax number from a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its fax number for public distribution. 47 U.S.C. § 227(b)(1)(C)(i)-(ii). The FCC defines "established business relationship" as

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or

---

[2] Under the FCC's interpretation of the fax advertising rules, the "sender" is "the person or entity on whose behalf the advertisement is sent. In most instances, this will be the entity whose product or service is advertised or promoted in the message." 21 F.C.C.R. 3787, at 3808. In this case, as discussed in the context of the pending motion, the "sender" is WEI and Daniel Wagener.

13

> residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(6). Additionally, the FCC requires the sender to obtain the "prior express invitation or permission" from the consumer before sending a fax. 21 F.C.C.R. 3787, 3808 (*In the Matter of Rules and Regulations Implementing the [TCPA]*) (Apr. 6, 2006). It is WEI's responsibility to demonstrate the existence of established business relationships and consent. *Id.* at 3794 (noting that the entity sending the fax is in the "best position" to have records showing the relationships, "such as purchase agreements, sales slips, applications and inquiry records"); *id.* at 3807 (senders "must be prepared to provide clear and convincing evidence of the existence of such permission.").

At the class certification stage, this Court noted that there was no evidence in the record that any of the alleged recipients of the WEI fax consented to receive the fax, and that the defendants did nothing to confirm that the intended 20,000 recipients of their fax had affirmatively consented to receive such faxes. Feb. 11, 2014 Mem. Op. at 11-12. This Court added that the defendants appeared to have simply hired the services of a "fax blaster" company without any inquiry as to whether or how that company obtained consent. *Id.*

This record compels judgment in favor of the class on this issue. The defendants have adduced no evidence that they had any business relationship with any recipient of the fax blast, or that any recipient had consented to receive it. Consent is an affirmative defense—*see Grant v. Capital Mgmt. Servs., LP.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011) (unpublished); *see also Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 905 (N.D. Ill. 2012) (noting that the TCPA contains the affirmative defense of express consent)—so it is the defendants' burden to

adduce such evidence, but the defendants offer no evidence of consent at all. Instead, the defendants argue that they relied on Wilson's word that potential recipients consented to receive faxes. Defs. Resp. at 11. In support of its position, WEI asserts that Macaw (or B2B, depending on which party you ask) had permission from potential recipients to send those recipients faxes and that Wilson told Wagener that WEI had an existing business relationship with all potential recipients. *Id.*; Defs. 56.1 Resp. ¶ 58.[3] In other words, WEI now argues that it believed it had either the recipients' consent or at least the understanding that recipients would be entities that had existing business relationships with WEI.

Nothing in the statute, however, suggests that intent is an element of a TCPA violation. *See Penzer v. Transportation Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008) ("Numerous courts have determined that the TCPA does not require intent, except when awarding treble damages"); *State Industries, Inc. v. Twin City Fire Ins. Co.*, 158 Fed. Appx. 694, 697 (6th Cir. 2005) (unpublished) (the TCPA does not require proof of intent, which means that plaintiffs can recover for negligent violations). The plaintiffs also point to a recent FCC opinion in which the FCC clarifies that the sender is still liable for TCPA violations "even when relying upon the assertion of an intermediary that the consumer has consented to the [communication]." *In the Matter of GroupMe, Inc./Skype Comms.*, 29 F.C.C.R. 3442, at *4 (Mar. 27, 2014). The Court therefore holds that, in contesting their intent, the defendants have failed to present evidence sufficient to create a jury issue as to the issue of consent.

The Court notes as well that even if the defendants had presented evidence sufficient to raise a fact issue as to whether any class members consented to the WEI fax, or had an existing

---

[3] Wilson "stated orally and documents provided by him also stated that faxing only occurred when there was an existing business relationship and businesses had agreed to receive faxes." *Id.* ¶ 63.

15

business relationship with WEI, such that sending the fax to them would have been permissible, summary judgment on this issue would still be warranted because the statute requires that an unsolicited advertisement clearly and conspicuously notify a recipient that it may opt out of receiving any future unsolicited advertisements from the sender and that the sender's failure to comply, within 30 days, is unlawful. 42 U.S.C. § 227(b)(2)(D)(i)-(v); 47 C.F.R. § 64.1200(a)(4). In addition, the "opt-out notice" must contain a domestic phone number *and* fax machine number for the recipient to transmit its request. *Id.* at (iv). WEI's fax stated only that if the recipient "received this fax in error and would like to be removed from our database, call toll free 1-800-369-5723." Dkt. 190-1 at 1. It failed to advise that removal was required within 30 days and failed to provide an alternative fax number. Perhaps more significantly, it did not clearly advise the recipient that it had the right not to receive such unsolicited faxes, using instead a more ambiguous phrase, "if you received this fax in error." Whether the fax was sent or received in error is not the point of the required notice; the point is to advise the recipient that it has a legal right not to receive further unsolicited faxes from the sender. WEI's opt out notice failed to do this and was therefore not in compliance with Section 227. The plaintiffs are therefore entitled to summary judgment as to whether the recipients consented to receive the fax. *See Holtzman*, 728 F.3d at 683 ("Because Top of Mind omitted opt-out notices, it does not matter which recipients consented or had an established business relation with Turza.")

\* \* \*

For the reasons set forth above, the Motion for Partial Summary Judgment is granted.

Entered: September 4, 2014

_____
John J. Tharp, Jr.
United States District Judge